May it please the Court, I am William Larkins, representing the Robinson family. I would like to reserve three minutes for rebuttal. I would like to start by asking the Court to imagine that we have just ended a 150 year ground lease that began in 1858. The Robinson family forebears were actually farming this same land in Washington County in 1858. And to suppose for a minute that the prevailing value of land in Washington County farmland at that time was... Looking at it, this is a terrible deal. It arguably doesn't make sense from a business point of view. But we're not in the business, I don't think, of trying to correct bad deals. We'd be pretty busy and probably wrong any number of times. So the question is, if you're going to make the argument, look, the deal didn't make really sense interpreted in a particular way, I understand that. I have some sympathy for that. But that's not enough, is it? No, and I understand your question, Your Honor. The issue here is that the district court found first from the language of the lease that there was no ambiguity. Under Oregon law, that means there's only one plausible interpretation. And the point of the illustration I was going to make is that if we were to apply that, then we'd be talking about a lease spinning off 20 cents an acre today. And if we take this forward into 2127, the property will be spinning off what it is today. That's a plausible interpretation, but it really makes the field of plausibility quite vast, I would submit. And the Robinsons did offer an alternate plausible interpretation based on the language of the lease. What the district court failed to do in her analysis was to consider, along with the language of the lease, the extrinsic evidence of the circumstances of the formation of the lease. The district court's analysis seems to have been based primarily on the Yolkman case. And interestingly, her decision came out a couple of weeks, literally two weeks, after the Oregon Court of Appeals issued its decision in Batser Construction. It's understandable that that wouldn't be cited in the district court's summary judgment opinion in this case. Batser said there isn't a conflict between the Abercrombie case and the Yolkman case, that that conflict was illusory. And it said that the proper analysis is to look at the pre-formation extrinsic evidence and the language of the document to see if there's an ambiguity. But that's the first step. Let me do the following. Help me understand how to find an ambiguity in the lease. I'm just looking at the lease language in this table, the percentage set out below, percentage of total initial gross acreage cost based on $22,000 an acre, and then percentages go down and the dollars that you get from using those percentages, and then years 30 to 60 could be determined as set for us below, both as to the percentage and as to the actual rent. How do I get where you want to get, which is that the value per acre goes up, not merely that the percentage based on value per acre, based on $22,000, may change? How do I get to the, how can I possibly read this lease to allow at year 31 to adjust the value per acre? Your Honor, you start with the use of the word initial in that heading, percentage of total initial gross acreage cost based on $22,000 per acre. Unless the court thinks I'm putting too much weight on one word, we have several cases in this ambiguity analysis where the decision comes down to one or maybe two words. In the Western Surety case, which involved the construction at Bonneville Dam, and it was a release of claims by a subcontractor. So your view is the word initial is ambiguous because initial can mean one of two things. Number one, it can mean it's the first and therefore contemplates the second, or it can mean it's what we're taking at the first, at the beginning, and there's not necessarily going to be a second, a third, a fourth, a fifth. Correct. And that's the ambiguity. Yes. Look at the word initial, and because initial is ambiguous, therefore it can be. Yes. That's ambiguous. Yogevman provides a great example of that. That's the case that's supposed to kill us, but it involves the beach rentals, and it came down to the courts looking at the dictionary definition of the word residential. And instead of residential, that could mean a place you sleep, or it could mean a place you intend to live a long time. And in the context of that restrictive covenant in that case, the courts said that restrictive covenant is ambiguous, and they went to the second level of ambiguity analysis, and it was to look at some other circumstances, and eventually they actually went to maximum. Is there anything else in the body of that provision that's ambiguous? Yes, there are. In the same heading, you have this phraseology, gross acreage cost based on $22,000 per acre. Well, we don't know what that means. Based on? No one's contending that was the Robinsons' actual cost. They had owned the land since the 1850s. And then further down in the paragraph below the chart that describes the percentage adjustment, you have this reference to the then fair market value of properties. Wait, wait, wait, wait. Don't go so fast. It says at the commencement of the 31st year, the percentage to be used for determining shall be re-evaluated. That's what it says. You start there. And then it goes down and it said, upon each re-evaluation of the percentage, the percentage to be used shall be the ratio between the rental charge and the then fair market value of properties which are comparable to the lease premises. And then it goes on in the next sentence to say, the percentage to be used shall be determined by an MAI appraiser. Now, it talks about the percentage, which refers to a ratio. And as I understand the reading of the fair market value of properties are to look at ratios that are set by other lessors at the time of this 31st year. So you can determine the percentage ratio. It doesn't say, as it might have, that the appraiser who is being called in is to re-evaluate the fair market value of the subject, the leased property. So how do you get me to that connection? Because the fair market value of the properties by its language does not specifically, you can tell me there's an ambiguity there, but doesn't link to the subject property. I agree. And, Your Honor, that paragraph clearly is dealing with an adjustment of the percentage. My argument is, this is in context in the same section of the document that refers to this initial gross acreage cost. And it should have been in context in the district court's analysis of all this extrinsic evidence that preceded this. Had the district court followed what we would now call the BATSR analysis, and the Oregon Supreme Court has denied review of BATSR. It's had several other cases, the progeny of BATSR. The district court would have had before her the evidence that she eventually heard in the Reformation case about Bill Robinson's unmistakable intent about the prior drafts, particularly the draft by Attorney Steven Janik, which was crystal clear in its calling out $22,000 per acre that was going to be in effect for the entire duration of the lease. And we know from the record that Bill Robinson put a huge X through that provision. There's no doubt that that was rejected, and they went back to something far less clear. We have the testimony of Chet Robinson, who's still alive, who was at the negotiations about the party's understanding. And we have Terry Brandt's testimony that this language in the eventual lease was, I think as he put it, an attempt to get at a periodic bump to fair market value rentals. Now, if you have that extrinsic evidence as context for particularly in ambiguous terms such as initial, and you have some unexplained language here about based on $22,000 per acre, I'm not hanging the whole hat on the reference below to fair market value. I'm saying in context and putting ourselves in the shoes of the parties at the time, it's plausible. It is a plausible alternative reading to say the parties intended to adjust the dirt value as well as the percentage. But are you arguing that it's a unilateral mistake? Let's say we agree with your ambiguity. Are you saying now the contract should be reformed or we should take some action because, in fact, it was a unilateral mistake and Mr. Robinson's party shouldn't have signed it thinking it was one thing and it turned out to be another? Well, we have a finding by the district judge that it was indeed what she viewed as a unilateral mistake by Mr. Robinson. We're asking for two things in the alternative. Our first request is for reversal of the summary judgment because we've met the threshold which the Oregon cases say is low for establishing ambiguity. If there's an ambiguity, then resolving it is a question for the trier of fact, and it was inappropriate to grant summary judgment if you give every reasonable inference to the Robinsons. And the trier of fact would be whom? We requested a jury and believed we were entitled to one under the declaratory judgment statute. The posture here is, of course, the declaratory action. If we were looking at a reformation, Judge Beyer, I would conceive, frankly, that clear and convincing evidence of a mutual mistake is probably not in this record. I think, though, given the trial judge's finding that Bill Robinson unmistakably intended to You have a unilateral mistake. Pardon? You'll say that there's a unilateral mistake. And that Mr. Brandt unmistakably knew what Mr. Robinson wanted. And if the language was as clear as Judge Brown thinks it is, then it's the strongest of all inferences that Mr. Brandt knew he was taking advantage of a mistake. And that is the inequitable conduct. Yes. Now, the ordinary rule for unilateral mistake in reformation is one party is making a mistake and the other party either knew or should have known of the mistaken party's mistake. Is that Oregon law? Yes. That's the ordinary rule. Yes. So the question is, does Mr. Brandt know of Mr. Robinson's mistake? Or should he have known of Mr. Robinson's mistake? Well, we think unmistakably he should have known because Mr. Robinson was so clear and so... Who drafted this last draft of the agreement? I understand that Mr. Brandt's lawyer drafted a couple of earlier ones, but I'm not sure. Maybe I should know from the record, but I don't know. I believe the finding by the district court was we don't really know. Maybe that's why I don't know. So the jury would have to decide that the jury on a remand would be asked to decide whether or not under the totality of the extrinsic evidence circumstances that the intent, at least of Mr. Robinson, was that there would be a readjustment up of the ground value. The intent of the parties. So you're saying that there would be evidence to suggest both parties understood it, and this is a lately, after the fact, hatched interpretation by the lessee. Yes, in fact, Your Honor. But failing that, would there also be then a jury question as to, since we have a finding by the district court that there was unilateral mistake, are you saying what you would have this go back on is whether there was inequitable conduct on the part of the lessor because he knew or should have known that Robinson was misinformed. That's where it was. No, Your Honor, because that's been tried, and that's equitable, and I don't think... So that's out. Yeah. What we'd be asking a jury to decide is based on all the extrinsic evidence, and if we acknowledge that there's an ambiguity, and therefore there's something for the trier fact to resolve about the intent of the parties, what did they both intend... So you would have to win, the jury would have to agree that both parties really intended the language. I reserve three. I might go back to reserving two because I'd like to finish this thought. Okay. Well, you're out of time altogether. Finish your thought, and we'll give you a chance to respond. We're not going to push you off. Okay. My thought is that if we've established the ambiguity, then under the analysis under Oregon law the jury would hear not only the pre-formation extrinsic evidence but the post-formation, the practical construction of this lease by principle and its representatives who acknowledged in appraisal and in their evaluation of this ground lease that it was ambiguous and they made no assumptions about what would happen after 2007. The lessee is deceased, right? The lessor. The lessor is deceased. Mr. Robinson. If I said lessor... No, no, I probably... That they acknowledged in their appraisal of this asset and in their whole approach to buying this asset that there was this uncertainty about what was going to happen after the first 30-year period. Okay. Thank you. And we'll give you a chance to respond. Carla Scott on behalf of principle. The Robinsons' counsel both today and in their briefs have made much ado about nothing about some perceived confusion in Oregon case law about when a court may look to extrinsic evidence to determine whether a contract term is ambiguous. This court need not revisit its decision in the Webb case that Yogman overruled Abercrombie because the result here is the same. Abercrombie made clear that prior negotiations and drafts may not be admitted to contradict plain language in a contract. Yeah, but maybe the language isn't that plain. The way your client wants to construe this contract is commercially, I won't say necessarily as a matter of language, is commercially preposterous. No person in his right mind would have signed a lease that settles on a $22,000 valuation for 100 years. Well, I would first point out that... And there's no evidence that Mr. Robinson was not in his right mind. That is correct. The evidence is that he was an experienced businessman in real estate and other matters. But in 1978, at the time this contract was executed, there was great uncertainty about whether the land could be developed at all. There were permitting issues to be resolved. It was a wetland issue. There was a floodplain to be dealt with. It was unclear whether the lessees could develop it to achieve the value that it now has. Yeah, but I repeat, no person in his right mind would say over 100 years that the same valuation is going to be a fair valuation of that property over 100 years. I mean, we all know that there is inflation, not merely of land values, but generally in the economy. And while, indeed, there may well have been uncertainties, I think there probably were a fair number of uncertainties as to the value of the property at that time. Could it be developed and so on? The idea that the land would be worth $22,000 an acre now and 100 years from now, that just beggars the imagination. Let's see the foreclosures today. Maybe the value has gone back to $22,000. Being that as it may be, Oregon Court of Appeals has said, and among other cases, the Taylor's Coffee case, that the fact that a deal may have been improvident from one party's perspective. How about preposterous, not merely improvident? As Judge Breyer said earlier on in this case, it's not the court's job to fix bad deals. Well, but what if we think it's preposterous, and there's a word in here, initial, that suggests that that was not the intention to write a preposterous contract? Well, if you look at Section 2.1 from when it begins, it talks about the 99 years shall be payable for the whole 99 years based on the $22,000 per acre according to the percentage set out below. The initial is not relating to the per acre cost in the column. It is relating to the percentage. And the lease speaks only to re-evaluating the percentage. It always talks about the $22,000 being a fixed variable. To give the Robertsons what they're asking for here, the court would need to vary the terms of this contract by doing a couple of things, striking out the $22,000 and inserting a phrase to re-evaluate it at market price. And the contract shows elsewhere that where the parties intended to do so, they did so in the option to purchase provision in 17.3. The ratio, the percentage, is how the parties allocated risk that was existing at the time of contracting. It takes into account comparable rents to comparable properties, and that is how the parties intended to allocate the risk. The Robertsons were entitled and do get under this lease a consistent payment over 99 years if the property had turned out to be contaminated or not being able to be developed. What is the point of the word initial? In other words, if initial didn't mean first and then to be changed, why doesn't it say percentage of total gross acreage cost based on $22,000 per acre, 6, 6, 8, 8, 10, and then 2 be determined? Clearly that's a percentage that changes. Nobody argues that. But why do they have the word initial if it didn't mean, if it didn't refer to the $22,000? It is referring to the initial percentages. That column is solely dealing with percentages. It's not dealing with the fixed variable of the cost per acre. But it says initial gross acreage cost. So it should really say, if you're right, it should have said initial percentage of total gross acreage. In other words, the initial was put in the wrong place. I and I. That's really what you're trying to do is move initial up in front of percentage? I don't think it matters either way. This column. I would hope not because otherwise I think you just conceded your case. No, this column is dealing with percentages and how they may be changed. The paragraph leading into this table makes clear that the $22,000 per acre shall apply for the entire 99 years as multiplied by the percentages set forth below. And then in the paragraph that follows the table, it spells out how to recalculate the percentage. It does not speak to how to recalculate the net acre cost. Explain to me. I've focused on this textual provision on the reevaluation about the reference to then fair market value properties. What's the purpose of that clause? Why do they even have to refer to fair market values of properties? The percentage is calculated by the percentage is a ratio with the numerator. I understand that. But why does the appraiser, why can't the guy just go around, the appraiser go around and find out what landlords are charging as a percent of whether it's fair market value or not? Just what are lessors in the area charging on percentage leases? Who cares whether it's based on a fair market value or not? That is how the parties chose to escalate the rent in this case. Could they have achieved it without putting fair market value in? The evidence in the record is that the fair market that this person. There's no evidence in the record. You're saying we can't look to extrinsic evidence. So under your theory, is it necessary, under your understanding of what the function of this percentage factor is, that it needed to be based on a fair market value of comparable properties? Why wouldn't they have simply said the percentage shall be re-evaluated at 31st year on comparable leases in the Portland or wherever the area is? I don't know why they didn't say that. I wasn't there. We have to look at what the contract language says. I know, but we're trying to find. See, what you're saying, you're saying if we agree with the Robinsons, we're automatically decreeing that the contract means something different from what you contend. That's not the issue before us. The question, as I understand it before us, is whether or not there's enough under Oregon law to create an ambiguity so that there will be evidence, so you could put in evidence as to why they use that terminology and why it reinforces the interpretation you advocate for, and they could put in evidence to say no, no, no. The issue before the court today is whether the 22,000 per acre fixed variable can be replaced with something else. Yeah, that's right. And whether or not it contemplates that it looks to a ratio that is reasonable in light of what current market conditions are, looking at the fair market value of the property, and then what is the percentage that lessors apply to ground leases under those circumstances. I think we're conflating the fixed variable with the change in variable under this contract. The 22,000 per acre is fixed. Under your interpretation. That's what you say. Nothing in Section 2.1 suggests that the 22,000 per acre. But what an irony it would be, wouldn't it, that if you have a situation in which you can't move, can't adjust the fair market value of the acre, of the so-called cost of it, you can't adjust that, you'd have a circumstance in which other property out there where percentages may be adjusted between developed and undeveloped land, and those properties may or may not have problems and so forth, you may actually end up with a decrease in the rent, right? In other words, it starts out at 6%. Well, that can change. You could end up with 4% or 5%. So, in other words, you could be 50 years, 75 years later and start paying the landlord less money than what the landlord was getting, notwithstanding, by the way, I guess cost of living, I mean, not adjusting to real dollar values. It doesn't adjust to real dollar values. So you'd actually be giving less money to the landlord, even though you may have arguably land that's worth 5 times, 10 times the value. I mean, that's what this lease provides, as you interpret it to be. Never heard of such a lease. Just because it has never been seen before does not make it enforceable. Well, but it does raise a question. We've never seen it before. The parties chose to allocate the risk of development by applying a fixed net acreage. But you keep saying the parties chose. It's not at all clear to me that Mr. Robinson actually chose that. He might have been making a serious error. I mean, I have to say that he clearly made a serious error because we're here in court litigating this proposition. Anything that goes to litigation means there was an error somewhere. Otherwise, you should be out there and everybody's just doing their business. But I just can't get past the idea that this is not just an improvident deal. It is a preposterous deal. Assuming that Judge Brown was correct, that Mr. Robinson made a mistake in signing the lease, we still can't reform the contract here because even if the other side knew he was making it. Well, what about counsel's argument about inequitable conduct? That if he made a mistake, a unilateral mistake, he made it, the other side didn't make it, but the other side knew he was making it. And if the evidence shows that the other side knew he was making it, is that in and of itself inequitable conduct? Can that be viewed by a prior effect as inequitable conduct, therefore thereby justifying a reformation of the contract? That's the question. And I have two responses to that question. First, Judge Brown heard the evidence, listened to Mr. Brandt, and found that there was not clear and convincing evidence that he engaged in equitable conduct. Second, even if he did, you still have to find an antecedent agreement that the parties reached on how to calculate the rent. And she also found there was no such antecedent agreement, so there would be no basis as a matter of law, no matter if you have a finding of inequitable conduct here. This occurs to me. You probably know that we have a mediation unit. Has this case been mediated? I believe there have been a few settlement conferences. I was not involved in those. Settlement conferences with the assistance of our court mediators? I don't know if it was with the Ninth Circuit's assistance, but I know that in the past with this case there has been some settlement conferences. I believe it was before this appeal. Well, let me ask that. You must have been involved in this fairly recently, then, if you don't know whether this has been mediated in the Ninth Circuit. Correct. The attorney who worked on this brief has now left our firm for public work, so I came in after the briefing. Okay. Well, the other side, I'm sure, will be able to tell us. Let me just echo that sentiment by Judge Fletcher, because, I mean, this is a perfect case to be mediated. There's a lot of room in the middle to bring about a win situation for both parties, because no matter what we decide, I mean, we decide one way, obviously, or the other way, but it could involve a lot further litigation. Families are further dragged into it. Resources are expended. This is a perfect case because you can see what your limits are on either side and figure out a way to get to the middle. So I would just urge you to go back to mediation and use it. And I don't think it's a sign of weakness, by the way. On either side, the judges are telling you, go back and see if you can resolve it. Anyway, that's my point. Mediation is not arbitration, by the way. It's voluntary and it's non-binding. You all work out the agreement, and we don't impose. Our mediation program isn't any different from that. And if the mediation fails, which it sometimes does, we're very careful to keep the mediation process away from the judges. We have no idea what's done on the mediation, which is why I had to ask you whether you've even mediated. Okay. I understand. I would close just by, after acknowledging the Court's concern about the nature of this deal, that the Oregon cases that have allowed extrinsic evidence do so when the contract term itself is subject to two reasonable readings. We understand that. I mean, believe me, this is not the first contract case we've ever encountered. And we do understand extrinsic evidence and Oregon rules. And in this case, the Robinsons just have not offered a different reading within the four corners of the contract that can be set forth in any degree of definiteness so that the contract can be enforced. So we would ask that it be enforced as Judge Brown ruled. And I have nothing further. Okay. Thank you. We hear your argument. Why don't we start out with two minutes and we'll see what happens. I think I can do it in two. Okay. Maybe let me focus on the last point counsel made. What would you have this contract reform to? What is the antecedent agreement you think exists? Well, we think, based on all the extrinsic evidence, that the antecedent agreement was to do the adjustment. So it's just basically whatever the reasonable value of the market is. And what's the percentage? How does the percentage get arrived at? The percentage would be re-evaluated according to this paragraph under the chart. Yes. But where's the variable that you're changing? Pardon? What's the variable you're changing? So the appraiser goes out and makes two appraisals. Two appraisals. Exactly. The dirt and the capital. The dirt and the capital, even though the contract talks about the capital, not the dirt. Yeah. So then he makes the appraisal, in your view, of the cost per acre, the so-called bump, the bump up from $22,000. He makes that appraisal at year 31 and then again at year 61. 61. And if there are renewals, 100 and 125. But he also has to come back in with an appraisal of what the percentage ratio is, too. That's right. Yes, Your Honor. But what exactly was wrong with the district court's finding that there was not clear and convincing evidence of inequitable conduct? Where did the court err in that? I think that's a close call, Your Honor, and I think the best I can offer on that is that under every reasonable inference from the record, Mr. Brandt had to have known that this was a mistake and he was getting an awfully good deal. The Oregon Reformation law talks about sharp practice. All you need is you don't need fraud. You don't need overbearing force. You need sharp practice. Well, but you need some evidence of a sharp practice. I mean, just because the deal is very unfair to one side or the other doesn't mean, though, the other side is engaged in the sharp practice. I mean, I don't know. What all the, you know, limits on the land. I mean, according to counsel, there were all sorts of restrictions on this property, and development was a very uncertain thing, as is true always. And didn't Mr. Brandt testify that he needed certainty? Isn't that what the district court found? He had a perfectly plausible reason for it. Mr. Brandt testified in what Judge Brown called vagaries, and for purposes of trying to have the summary judgment overturned, we're saying his admission that there was supposed to be this bump to fair market value rent is part of the extrinsic evidence. If I may very briefly, Your Honor, the Oregon law on this plausibility, we don't need to come forward with the most plausible alternate explanation, nor even the more plausible. If we have an alternate plausible explanation, then that's enough to defeat the summary judgment and go back to the trier effect. The record in this case shows that in 2002, there's evidence that the per acre value of the dirt was $270,000. At excerpts of record 251 and 52, Judge Brown tried in her ruling to address this word initial, and if you read that, I urge you to do so. She didn't say what initial means. She didn't address it. The Baxter case says this is a binary approach, if you will. You look at the text and the extrinsic evidence at the initial analysis, and I think we've certainly shown enough that there is a plausible alternate reading of the language. And let me ask you, you have obviously lived with this case for a while. Has there been any mediation with the Ninth Circuit mediator of this case? We had a settlement conference with Judge Edward Levy in this building, Your Honor, and we did take a shot at it. It was with Judge Levy rather than with our mediating staff. Judge Levy is actually one of the best mediators I know. Yeah, and that's why we picked him, and he acted as a settlement judge. He wasn't with the mediation staff. I see. Would there be any objection to going back to mediation now that you've heard some of the responses of this court to the arguments? No, Your Honor. Okay. Thank both sides for their helpful arguments in this case. Principal Life Insurance Company v. Robinson is now submitted for decision. The last case on the argument calendar, Northwest Environmental Defense Center v. Brown and the United States of America. That's the courtroom. Well, the air is excellent. Absolutely. Yes.
judges: Fletcher, Fisher, Fletcher